974 P.2d 1033

**In the Matter of SOUTHERN FOODS GROUP, L.P., dba Meadow Gold Dairies, Petitioner–Appellant,**

v.

**STATE of Hawai'i, DEPARTMENT OF EDUCATION, Respondent–Appellee,**

and

**House Foods Hawaii Corporation, dba Foremost Dairies Hawaii, Intervenor**

**No. 21715.**

Supreme Court of Hawai'i.

March 23, 1999.

---

Marc E. Rousseau (C. Michael Hare and Dennis J. Gaughan with him on the briefs) of Cades Schutte Fleming & Wright, for petitioner-appellant Southern Foods Group, L.P. dba Meadow Gold Dairies

Russell A. Suzuki, Deputy Attorney General (Patricia Ohara, Deputy Attorney General with him on the brief) for respondent-appellee State of Hawai'i, Department of Education

Michael C. Bird (John T. Komeiji with him on the brief) of Watanabe, Ing & Kawashima

for intervenor House Foods Hawaii Corporation dba Foremost Dairies Hawaii

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

The instant appeal arises from respondent-appellee State of Hawai'i Department of Education (hereinafter referred to as the "DOE")'s procurement of a supplier to furnish and deliver fresh milk to public schools in the State of Hawai'i for the 1998/1999 school year. Petitioner-appellant Southern Foods Group, L.P. dba Meadow Gold Dairies (hereinafter referred to as Meadow Gold) appeals from the Department of Commerce and Consumer Affairs (DCCA) Administrative Hearings Officer's affirmance[1] of the DOE's rejection of Meadow Gold's bid and the award of the contract to intervenor House Foods Hawaii Corporation, dba Foremost Dairies Hawai'i (hereinafter referred to as Foremost).

Because Meadow Gold submitted a bid with "multiple or alternate offers" in violation of Hawai'i Administrative Rules (HAR) § 3–122–4 (1995), the DOE correctly rejected Meadow Gold's bid as nonresponsive, under Hawai'i Revised Statutes (HRS) § 103D–104 (1996).[2] Accordingly, inasmuch as the in-stant Invitation for Bids (IFB) prohibited "multiple or alternate offers," the hearings officer correctly interpreted HRS Chapter 103D in concluding that the best interests of the DOE, as addressed in HRS § 103D–308 (1993 & Supp.1997) and HAR § 3–122–95 (1995), were irrelevant and in concluding that the accompanying rules adopted pursuant to Chapter 103D mandated rejection of Meadow Gold's bid. Therefore, we affirm.

## I. BACKGROUND

### A. The Invitation for Bids

The following facts are largely undisputed. On February 5, 1998, the DOE's Procurement and Distribution Section issued an Invitation for Sealed Bids for job number E98–21 (IFB No. E98–21), in order to procure the delivery and furnishing of fresh 2%, whole and lowfat chocolate milk for various schools in the State of Hawai'i (the "Bid Solicitation"). The Bid Solicitation consisted of four contracts and provided four respective bid pages for the islands of O'ahu, Hawai'i, Maui, and Kaua'i. The present appeal only challenges the award of the O'ahu contract.

In addition to the bid page,[3] pursuant to statute, the Bid Solicitation contained special conditions regarding the form of the bid.[4]

---

1. The Hawai'i Supreme Court retains exclusive jurisdiction to review administrative hearings based upon HRS Chapter 103D, the Hawai'i Public Procurement Code. See Hawai'i Revised Statutes (HRS) § 103D–710(a) (1993). "The review shall be . . . conducted on the record of the administrative proceedings, and briefs and *oral argument*." HRS § 103D–710(d) (emphasis added.) Despite this legislative mandate, this court retains the authority to decide which matters shall be set for oral argument. See HRS § 602–10 (1979); Hawai'i Rules of Appellate Procedure (HRAP) 34(a).

2. HRS § 103D–104, the definitions section of HRS Chapter 103D, provides in pertinent part that a " '[r]esponsive bidder' means a person who has submitted a bid which conforms in all material respects to the invitation for bids."

3. The O'ahu contract's bid page was numbered "OF–3."

4. The Bid Solicitation contained in relevant part the following special conditions:

 *1A.1 PROVISION*—The furnishing and delivery of . FRESH MILK . . . shall be in accor-dance with these Special Conditions, the specifications, the General Conditions, which is included and made a part hereof.
 The period of this agreement shall be from July 1, 1998 through June 30, 1999 . . . .
 . . . .
 *1C.2 PRODUCT PREFERENCE*—Registered and qualified "Hawaii Produced or Manufactured" products, Class III, shall have ten percent price preference when one or more offer(s) are of non-registered and qualified Hawaii Produced or Manufactured products. *When all offers are registered and qualified Hawaii Produced or Manufactured products, no preferences shall be applied.*
 . . . .
 Preference, when applicable, shall be used to determine lowest responsive and responsible evaluated offer and not to be used as awarded amount.
 . . . .
 *1D.1 AWARD OF CONTRACT*—Award shall be made to offeror(s) submitting the lowest *responsive* and responsible bid price for each Group numbers . . . .
 . . . .

For example, the Bid Solicitation contained condition 2A.1, which provided the following:

A proposal that contains any omission, erasure, addition not called for, conditional bid or irregularity of any kind may be rejected....

The bid price shall be all inclusive....

....

Unless otherwise stated, bidder shall offer only one (1) bid item/number. If more than one bid is offered, all bids shall be rejected for that item/number.

The record reveals that, in response to the Bid Solicitation, only Meadow Gold and Foremost submitted bid sheets for the island of Oʻahu. It is undisputed that Meadow Gold submitted two OF–3 pages. Meadow Gold's first OF–3 page indicated that all of the milk would consist of Class III Hawaiʻi products, arguably entitling the bid to a 10% preference consideration, and provided the following prices per half ·pint of milk: (1) Group I—$.26; (2) Group II—$.25; (3) Group III—$.235; (4) Group IV—$.24; (5) Group V—$.24; (6) Group VI—$.26; (7) Group VII—$.26; and (8) Group VIII—$.26. Meadow Gold's second OF–3 page did not indicate a Hawaiʻi products preference, yet provided the following prices: (1) Group I—$.236363; (2) Group II—$.227272; (3) Group III—

$.213636; (4) Group IV—$.218181; (5) Group V—$.218181; (6) Group VI—$.236363; (7) Group VII—$.236363; and (8) Group VIII—$.236363.

Foremost submitted one OF–3 page, which also indicated that all of the milk would consist of Class III Hawaiʻi products, arguably entitling the bid to a 10% preference consideration, and provided the following prices: (1) Group I—$.2259; (2) Group II—$.2824; (3) Group III—$.2223; (4) Group IV—$.2824; (5) Group V—$.2824; (6) Group VI—$.2337; (7) Group VII—$.2259; and (8) Group VIII—no bid.

## B. *The Bid Opening*

· The DOE opened the IFB No. E98–21 bids on February 25, 1998. A DOE representative quickly discovered that Meadow Gold submitted two OF–3 pages and announced "I have a duplicate bid for Oahu which means a rejection." This prompted a series of meetings and communications between Meadow Gold and the DOE.

The first written communication, a letter dated March 2, 1998, was from Meadow Gold to Mr. Eric Tom, a DOE Procurement and Distribution Specialist. Therein, Meadow Gold stated that

2A.2 EXAMINATION OF GENERAL CONDITIONS, SPECIFICATIONS, SITE OF WORK, ETC.—It shall be conclusively understood and agreed herein that it shall be the interested party's responsibility to examine the documents provided and to familiarize himself with all of the requirements herein. No additional allowance shall be granted because of the lack of knowledge of such conditions.

....

2A.10 DISQUALIFICATION OF BIDDERS—Any one or more of the following causes will be considered as sufficient for disqualification of the bidder:

....

b. More than one proposal from an individual, firm, corporation or joint venture under the same or different names.

....

h. If the proposal shows any noncompliance with applicable law or contains any unauthorized additions or deletions, conditional bid, incomplete bid, or irregularities of any kind which may tend to make the bid/proposal incomplete, indefinite, or ambiguous as to its meaning.

....

2B.1 AWARD OF CONTRACT—Award will be made to the *responsive* and responsible bidder submitting the lowest bid price. Normally, award is within sixty (60) days after the bid opening but in no case will award be made until all necessary investigations are made.

....

If the lowest bid or any other bid is rejected, or if the bidder to whom the contract was awarded fails to enter into the contract, the Superintendent may, at his discretion, award the contract to the next lowest bidder or may publish another call for bidders....

....

2C.4 PREFERENCE FOR LOCAL PRODUCTS—Section 103–42 and 103–43, Hawaii Revised Statutes, provides for preference to bidders submitting bids and claiming local product preferences for products qualified and registered with the State Comptroller, Department of Accounting and General Services....

(Brackets and emphases added.) HRS §§ 103–41 to 103–45 (1993) regarding Hawaii product preference were repealed. *See* 1994 Haw. Sess. L. Act 186, § 21 at 428. HRS § 103D–1002 (Supp.1998) now addresses Hawaiʻi product preference.

this letter is an explanation of our actions in connection with the sealed bid for the Oahu school milk and to assist you in making a decision regarding this matter.

At the outset, *our two bids* for the Oahu school milk were in no way intended to mislead or deceive the [DOE]. . . .

*Our best intent behind these two bid sheets* was to offer the DOE the best milk prices available on Oahu, thereby reducing the DOE's costs. As long as milk supplies are available, Meadow Gold would supply locally processed milk; however, the poor economy in Hawaii has caused many local milk producers to close operation or reduce production. If the trend continues there may be a significant shortage of locally produced milk and Meadow Gold would have to rely on mainland suppliers. Therefore, *we were merely offering the DOE the best possible alternatives available to us in the market.*

*If the dual bid sheets are interpreted as a violation of 2A.10 of the Special Conditions, we believe that the withdrawal of one bid sheet would not unfairly taint the sealed bid process* and would provide the DOE with the best possible offer that Meadow Gold is able to make. We believe that this would be governed by § 3–122–31(c)(3) of the Hawaii Administrative Rules, Title 3 . . . which provides in part:

> If the mistake is not allowable under paragraphs (1) [arithmetical] and (2) [minor informality not affecting price, quantity, delivery or contractual conditions], *but is an obvious mistake that if allowed to be corrected or waived is in the best interests of the government agency or for the fair treatment of other bidders, and the chief procurement officer or . . . the head of the purchasing agency concurs with this determination,* the procurement officer shall correct or waive the mistake.

(Emphases added.) Interpreting the March 2, 1998 communication as a request to withdraw one of the two OF–3 pages, by letter dated March 9, 1998, Eric Tom responded:

. . . In addition and during our meeting you/your representatives further advised me that one of [the] bids did not meet our procedures in that it was not a qualified product.

Based on above, your position of providing the DOE a choice but at the same time arguing one of the bid pages was for a non qualified product [sic], I must invite your attention to paragraph 7 of section 2A.1 page SC 2–1 within the Special Conditions entitled Bid/Proposal Requirements. Reference reads as follows: "Unless otherwise stated, bidder shall offer only one (1) bid per item/number. If more than one bid is offered, all bids shall be rejected for that item/number."

On March 12, 1998, Meadow Gold formally protested the rejection of its bid pursuant to HRS § 103D–701 (1993 & Supp.1997) and HAR § 3–126–3 (1995) by writing to Mr. Alfred Suga, DOE Assistant Superintendent in charge of the DOE's purchasing agency. Meadow Gold sought reversal of the rejection or a rebid of the contract.

Notwithstanding its March 2, 1998 description of "*our two bids* for the Oahu school milk," Meadow Gold contended that it "did not submit two bids for the contracts . . . [but] submitted one, integrated bid reflected on two bid sheets identified as OF–3. Meadow Gold intended these bid sheets to be treated as a single, unconditional bid." Meadow Gold further argued that, because it did not condition its bid to gain unfair advantage over other bidders, it was a responsive bidder under HRS § 103D–104, and that "[t]here is no prohibition in the bid specifications for submitting a bid price structured in this manner." Meadow Gold conceded that its bid may have been "'irregular' or a mistake," but urged the DOE to exercise its discretion in correcting the bid. Finally, without citing to which price it submitted, Meadow Gold argued that its bid prices on Groups Nos. II, IV, and V were the lowest and would result in a savings of approximately $595,000.00.

On March 18, 1998, Suga issued a final decision,[5] affirming the rejection of Meadow

---

5. Because of Suga's characterization of Meadow Gold's March 12, 1998 letter as both a protest

and a request for reconsideration, the DOE issued another letter on April 2, 1998 notifying

Gold's bid as nonresponsive in violation of the requirement that the bidder submit "only one bid offer per item/number."

## C. The Administrative Hearing

On April 8, 1998, Meadow Gold appealed the DOE's rejection of its bid to the DCCA's Office of Administrative Hearings, pursuant to HRS § 103D–709 (1993 & Supp.1997).[6] The DCCA hearings officer issued a notice of hearing and pre-hearing conference on April 23, 1998; the pre-hearing conference was set for May 4, 1998, and the hearing was set for May 11, 1998. However, because of scheduling conflicts of both parties, the pre-hearing conference was rescheduled to May 7, 1998, and the parties agreed to set a date for the hearing. Because the parties had not agreed on a hearing date and HRS § 103D–709(b) required the hearing be held within twenty-one (21) days of receipt of the appeal, on May 12, 1998, the hearings officer set the hearing for the next day, on May 13, 1998. Although the notice was sent by facsimile to Meadow Gold's attorneys,[7] Meadow Gold was unaware of the hearing. At the hearing, without Meadow Gold present, the hearings officer granted Foremost's motion to intervene and the DOE's oral motion to dismiss without prejudice. That same day, on May 13, 1998, the hearings officer issued a written order of dismissal.

After learning that the hearing was held and that the matter was dismissed, by letter dated May 13, 1998, Meadow Gold requested that the matter be reopened. However, the hearings officer declined, because the request was not in the form of a formal motion. On May 15, 1998, Meadow Gold moved to set aside the order dismissing Meadow Gold's request for an administrative hearing and to reset a hearing date.[8] On June 5, 1998, Meadow Gold's motion was granted and the hearing was reset for June 15, 1998. At the hearing, Meadow Gold attempted to present evidence regarding its intent to submit an "integrated" bid and regarding the savings the DOE would receive if its bid were not rejected. Apparently based upon Hawai'i Rules of Evidence (HRE) Rule 402 (1993), the hearings officer excluded this evidence as irrelevant. Meadow Gold was limited to making offers of proof with respect to both issues.

On July 16, 1998, the hearings officer entered, in pertinent part, the following COLs:

> The evidence presented established that Petitioner submitted two OF–3 sheets in response to the Bid Solicitation, one page representing the price for locally produced

Meadow Gold of its right to an administrative appeal before the DCCA.

6. HRS § 103D–709 provides in part:
 **Administrative proceedings for review.** (a) The several hearings officers appointed by the director of the [DCCA] ... pursuant to section 26–9(f) shall have jurisdiction to review and determine *de novo* any request from any bidder ... aggrieved by a determination of the chief procurement officer, head of a purchasing agency, or a designee of either officer....

 ....

 (c) The party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence. All parties to the proceeding shall be afforded an opportunity to present oral or documentary evidence, conduct cross-examination as may be required, and argument on all issues involved. *The rules of evidence shall be strictly adhered to.*

 ....

 (f) *Hearings officers shall decide whether the determinations* of the chief procurement officer

or the head of the purchasing agency, or their respective designees *were in accordance with the Constitution, statutes, regulations, and the terms and conditions of the solicitation or contract. ...*
(Emphases added.)

7. Meadow Gold explains and the record reveals that the facsimile transmission was smudged and the hearing date appeared to be May 18, 1998.

8. Because the ten-day time period for judicial review with the supreme court was about to expire, Meadow Gold also filed an application for judicial review on May 21, 1998. On June 5, 1998, this court granted Meadow Gold's motion to remand the matter to the DCCA's Office of Administrative Hearings for a hearing on the merits.

 On June 9, 1998, Meadow Gold also moved, before the DCCA, for the hearings officer's disqualification based upon personal bias. The motion was summarily denied. On June 10, 1998, the parties stipulated to dismiss the application for judicial review filed on May 21, 1998.

milk, for which the Hawaii preference was claimed, and a second page of non-Hawaii produced milk, for which the Hawaii preference was not claimed. The evidence also established that respondent rejected Petitioner's submission on the basis that Petitioner's bid was not responsive to the Bid Solicitation, which required one bid per item.

Hawaii Administrative Rules § 3–122–4 provides:

> § 3–122–4 **Multiple or alternate offers.** (a) Unless multiple or alternate offers are specifically provided for, the solicitation shall state that multiple or alternate offers shall not be accepted.
>
> (b) *When prohibited, multiple or alternate offers shall be rejected,* provided that if an offeror clearly indicates a primary offer, it shall be considered for award as though it were the only offer submitted by the offeror.
>
> (c) This section shall be set forth in the solicitation, and if multiple or alternate offers are allowed, it shall specify their treatment.

It is not disputed that Petitioner did not indicate a primary offer. Instead, petitioner argued that it submitted an "integrated" bid, consisting of one bid with two bid sheets, and its "integrated bid was responsive to the Bid Solicitation because: (1) when rounding is properly conducted, the two prices are identical, and (2) when the two bid sheets are considered together, the amount to be charged to respondent is readily ascertainable.

... Petitioner's calculations add ten percent to the non-Hawaii product price in order to determine the Hawaii product price. HRS § 103D–1002 provides in part:

> [ (a) A purchasing agency shall review all specifications in a bid or proposal for purchase from the Hawai'i products list where these products are available; provided that the products:
>
> ... ]
>
> (3) Unloaded, including applicable general excise tax and use tax, does not exceed the lowest delivered price of a similar non-Hawai'i product by more than:

> . . . .
>
> (c) *Ten per cent where class III Hawai'i products are involved.*
>
> . . . .
>
> (d) Where a bid or proposal contains both Hawai'i and non-Hawai'i products, then for the purpose of selecting the lowest bid or purchase price only, the price bid or offered for *a Hawai'i product item shall be decreased by subtracting therefrom:* three per cent, five per cent, or *ten per cent for the class I, class II, or class III Hawai'i product items bid or offered, respectively.* The lowest total bid or proposal, taking the preference into consideration, shall be awarded the contract unless the bid or offer provides for additional award criteria. The contract amount of any contract awarded, however, shall be the amount of the bid or price offered, exclusive of the preferences.

Consequently, for purposes of bid evaluation only, the prices reflected on the two OF–3 pages submitted by Petitioner would have been equal had Petitioner's non-Hawaii product OF–3 page reflected Petitioner's Hawaii product price less ten per cent, as provided by HRS § 103D–1002. However, Petitioner added 10 per cent to the non-Hawaii product price, resulting in a price that, for purposes of bid evaluation, is not equivalent. Accordingly, the Hearings Officer finds that Petitioner offered more than one bid for the same item without clearly indicating a primary offer, and concludes that pursuant to the terms of the Bid Solicitation and HAR § 3–122–4, Petitioner's bid was nonresponsive and must be rejected. The Hearings Officer also concludes that, contrary to Petitioner's assertions that the amount to be charged to Respondent is readily ascertainable when the two OF–3 pages are read together, the bid submitted by Petitioner contained an irregularity which made its bid indefinite or ambiguous, requiring Petitioner to be disqualified pursuant to Section 2A.10 of the Bid Solicitation.

In the alternative, Petitioner argued that Respondent failed to follow the provisions

of HAR § 3–122–95(b) when Respondent rejected its bid. HAR § 3–122–95(b) provides:

**§ 3–122–95 (1995) Cancellation of solicitations and rejection of offers.**

[ . . . . ]

(b) The reasons for the cancellation or rejection shall:

(1) *Include but not be limited to cogent and compelling reasons why the cancellation of the solicitation or rejection of the offer is in the purchasing agency's best interest;* and

(2) Be made part of the contract file.

HAR § 3–122–95 implements HRS § 103D–308 [ (1993 & Supp.1997) ], which states:

An invitation for bids, a request for proposals, or other solicitation may be canceled, or any or all bids or proposals may be rejected in whole or in part as may be specified in the solicitation, when it is in the best interest of the governmental body which issued the invitation, request or other solicitation, in accordance with the rules adopted by the policy board. The reasons therefor shall be made a part of the contract file.

The Hearings Officer finds HAR § 3–122–95(b) to be inapplicable to the case at bar. Petitioner's bid was rejected because it was nonresponsive to the Bid Solicitation. It was not rejected because Respondent deemed it to be in the best interest to cancel the Bid Solicitation and/or reject the Petitioner's offer, which pursuant to HAR § 3–122–95(b), would then require Respondent to articulate cogent and compelling reasons why rejection is in Respondent's best interests.

Petitioner also argued that it should be allowed to correct its mistake, as allowed by HAR § 3–122–31(c)(3) which provides:

**§ 3–122–31 Mistakes in bids.** (a) Correction or withdrawal of a bid because of an obvious mistake in the bid is permissible to the extent it is not contrary to the best interest of the government agency or to the fair treatment of other bidders.

. . . .

(c) Corrections to bids after opening but prior to award may be made under the following conditions:

. . . .

(3) If the mistake is not allowable under paragraphs (1) and (2), but is an obvious mistake that if allowed to be corrected or waived is in the best interest of the government agency or for the fair treatment of other bidders, and the chief procurement officer or the head of the purchasing agency concurs with this determination, the procurement officer shall correct or waive the mistake.

The Procurement Code prescribes strict procedures for the procurement of goods and services by state agencies for the purposes of:

(1) providing fair and equitable treatment of all persons dealing with the government procurement system; (2) fostering broad-based competition among vendors while ensuring accountability, fiscal responsibility, and efficiency; and (3) increasing public confidence in the integrity of the system.

*Carl Corp. v. State Department of Education,* 85 Hawai'i 431 at 459, 946 P.2d 1 (1997). Because the prices set forth on the two OF–3 pages were not found to be identical, and it is not clearly evidenced from the bid document which of the two OF–3 pages Petitioner intended as its bid price, allowing Petitioner to correct its bid after bid opening would give Petitioner "two bites at the apple" and a competitive advantage over other bidders. Accordingly, the Hearings Officer concludes that Petitioner should not be allowed to correct its bid as it would not result in the fair treatment of the other bidders.

. . . .

Based upon the foregoing considerations, the Hearings Officer finds and concludes that Petitioner was not a responsive bidder, and that Petitioner failed to prove by a preponderance of the evidence that Respondent's rejection of its bid was improper and not in accordance with the

Constitution, statutes, regulations, and the terms and conditions of the solicitation.

(Brackets and emphases added.) (Footnotes omitted.)

Meadow Gold filed an application for judicial review of the hearings officer's decision on July 16, 1998.

## II. *STANDARD OF REVIEW*

 When reviewing decisions of an administrative hearings officer based upon the Hawai'i Public Procurement Code, the appellate standard of review is governed by HRS § 103D–710(e) (1993). *See In re Carl Corp. v. State, Dep't of Educ.*, 85 Hawai'i 431, 446, 946 P.2d 1, 16–17 (1997) (stating that HRS § 103D–710(e) is "virtually identical to HRS § 91–14(g)"). HRS § 103D–710(e) provides:

Upon review of the record the court may affirm the decision of the hearings officer issued pursuant to [HRS] section 103D–709 or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if substantial rights may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority or jurisdiction of the chief procurement officer or head of the purchasing agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Furthermore,

conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and the Hearings Officer's exercise of discretion under subsection (6). Accordingly, a reviewing court will reverse a Hearings Officer's finding of fact if it concludes that such . . . finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. On the other hand, the Hearings Officer's conclusions of law are freely reviewable.

*Arakaki v. State, Dep't of Accounting and General Serv.*, 87 Hawai'i 147, 149–50, 952 P.2d 1210, 1212–13 (1998) (citing *In re Carl Corp.*, 85 Hawai'i at 446–47, 946 P.2d at 16–17) (original emphasis and brackets omitted).

"A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." *Price v. Zoning Bd. of Appeals of City and County of Honolulu*, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994). When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. *Dole Hawaii Division– Castle & Cooke, Inc. v. Ramil*, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). "[T]he court should not substitute its own judgment for that of the agency." *Id.* (citing *Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)).

*Poe v. Hawai'i Labor Relations Bd.*, 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998).

 Regarding an agency's discretion, appellate courts must consider that

[d]iscretion denotes the absence of a hard and fast rule. When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.

*Booker v. Midpac Lumber Co.*, 65 Haw. 166, 172, 649 P.2d 376, 380 (1982) (citations and internal brackets omitted). A hearings officer abuses his or her discretion when he or she "clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Craft v. Peebles*, 78 Hawai'i 287, 301, 893 P.2d 138, 152 (1995) (citation and internal quotation marks omitted).

*Arakaki,* 87 Hawai'i at 149–50, 952 P.2d at 1212–13. Indeed, in order to reverse or modify an agency decision, the appellate court must conclude that an appellant's substantial rights were prejudiced by the agency. *See In re Application of Hawaiian Elec. Co.,* 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (citing *Outdoor Circle v. Harold K.L. Castle Trust Estate,* 4 Haw.App. 633, 638, 675 P.2d 784, 789 (1983), *cert. denied,* 67 Haw. 1, 677 P.2d 965 (1984)).

Finally, expressing further caution with regard to reviewing administrative determinations, this court has verbalized the following caveat:

> In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, *a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise* and one seeking to upset the order bears the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

*Id.* (citing *In re Application of Hawaii Elec. Light Co., Inc.,* 60 Haw. 625, 629, 594 P.2d 612, 617 (1979)) (internal citations and quotation marks omitted) (emphasis added).

### III. *DISCUSSION*

 The DOE and Foremost contend that the dispositive issue is whether the statute mandated rejection of Meadow Gold's bid as nonresponsive under the Hawai'i Public Procurement Code, HRS Chapter 103D. We agree. Therefore, this appeal tenders a question of statutory interpretation.

"The starting point in statutory construction is to determine the legislative intent from the language of the statute itself." *State v. Kaakimaka,* 84 Hawai'i 280, 289, 933 P.2d 617, 626, *reconsideration denied* 84 Hawai'i 496, 936 P.2d 191 (1997) (quoting *State v. Ortiz,* 74 Haw. 343, 351–52, 845 P.2d 547, 551–52 (citations omitted), *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993)).

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(10) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool. *Gray[ v. Administrative Dir. of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) ] (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). "Laws in *pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Korean Buddhist Dae Won Sa Temple of Hawaii,* 87 Hawai'i at 229–30, 953 P.2d at 1327–28 (quoting *State v. Cullen,* 86 Hawai'i 1, 8–9, 946 P.2d 955, 963–64 (1997) (some brackets in original and some added)).

"[A] statute is ambiguous if it is capable of being understood by reasonably well-informed people in two or more different senses." *State v. Toyomura,* 80 Hawai'i 8, 19, 904 P.2d 893, 904 (1995) (citing 2A N. Singer, *Sutherland Statutory Construction,* § 45.02, at 6 (5th ed.1992)) (internal quotation marks omitted). "[A] rational, sensible and practicable interpre-

tation of a statute is preferred to one which is unreasonable or impracticable[.]" *State v. Jumila,* 87 Hawai'i 1, 9, 950 P.2d 1201, 1209 (1998) (quoting *Keliipuleole v. Wilson,* 85 Hawai'i 217, 221–22, 941 P.2d 300, 304–05 (1997) (brackets, internal quotation marks, and citations omitted)). "The legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *State v. Arceo,* 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (citation and internal quotation marks omitted).

*Kim v. Contractor's License Bd.,* 88 Hawai'i 264, 269–70, 965 P.2d 806, 811–12 (1998) (some brackets added and some in original).

A. *Meadow Gold's Bid for the O'ahu Contract to Furnish Milk to Hawai'i Schools Was Properly Rejected by the DOE.*

▌ Turning to the procurement code, HRS § 103D–302 (Supp.1997), entitled "Competitive Sealed Bidding," provides in relevant part:

(a) Contracts shall be awarded by competitive sealed bidding except as otherwise provided in section 103D–301.[9] Awards of contracts by competitive sealed bidding may be made after single or multi-step bidding. Competitive sealed bidding does not include negotiations with bidders after the receipt and opening of bids. *Award is based on the criteria set forth in the invitation for bids.*

(b) An invitation for bids shall be issued, and shall include a purchase description and all contractual terms and conditions applicable to the procurement. . . .

(c) Adequate public notice of the invitation for bids shall be given a reasonable time before the date set forth in the invitation for the opening of bids. . . .

(d) Bids shall be opened publicly in the presence of one or more witnesses, at the time and place designated in the invitation for bids. The amount of each bid and other relevant information specified. by rule, together with the name of each bidder shall be recorded. The record and each bid shall be open to public inspection.

(e) *Bids shall be unconditionally accepted without alteration or correction, except as authorized in this chapter or by rules adopted by the policy board.*

(f) *Bids shall be evaluated based on the requirements set forth in the invitation for bids.* These requirements may include criteria to determine acceptability such as inspection, testing, quality, workmanship, delivery, and suitability for a particular purpose. Those criteria that will affect the bid price and be considered in evaluation for award shall be objectively measurable, such as discounts, transportation costs, and total or life cycle costs. The invitation for bids shall set forth the evaluation criteria to be used. No criteria may be used in bid evaluation that are not set forth in the invitation for bids.

(g) *Correction or withdrawal* of inadvertently erroneous bids before or after award, or cancellation of invitations for bids, awards, or contracts based on such bid mistakes, *shall be permitted in accordance with rules adopted by the policy board. After bid opening no changes in bid prices or other provisions of bids prejudicial to the interest of the public or to fair competition shall be permitted.* Except as otherwise provided by rule, all decisions to permit the correction or withdrawal of bids, or to cancel awards or contracts based on bid mistakes, shall be supported by a written determination made by the chief procurement officer or head of a purchasing agency.

(h) The contract *shall be awarded* with reasonable promptness by written notice *to the* lowest responsible and *responsive bid-*

9. HRS 103D–301 (1993) provides for the "Methods of source selection":

Unless otherwise authorized by law, all contracts shall be awarded by competitive sealed bidding pursuant to section 103D–302, except as provided in:
(1) Section 103D–303 (Competitive sealed proposals);
(2) Section 103D–304 (Professional services procurement);
(3) Section 103D–305 (Small purchases);
(4) Section 103D–306 (Sole source procurement); and
(5) Section 103D–307 (Emergency procurements).

*der whose bid meets the requirements and criteria set forth in the invitation for bids.*

. . .

(Emphases and footnote added.)

As noted above, special condition No. 2A.1 of IFB No. E98–21 provided that "[a] proposal that contains any omission, erasure, addition not called for, conditional bid or irregularity of any kind *may* be rejected. . . . Unless otherwise stated, bidder shall offer only one (1) bid item/number. If more than one bid is offered, all bids *shall* be rejected for that item/number." (Emphases added). Further, HAR § 3–122–4 (1995), which is incorporated by reference into the Bid Solicitation, provided:

> *Multiple or alternate offers.* (a) Unless multiple or alternate offers are specifically provided for, the solicitation shall state that multiple or alternate offers shall not be accepted.
>
> (b) *When prohibited, multiple or alternate offers shall be rejected, provided that if an offeror clearly indicates a primary offer, it shall be considered for award as though it were the only offer submitted by the offeror.*
>
> (c) This section shall be set forth in the solicitation, and if multiple or alternate offers are allowed, it shall specify their treatment.

(Emphasis added.)

Based upon its interpretation of the foregoing, the DOE concluded that Meadow Gold's bid, which contained two OF–3 sheets, *i.e.,* two bids for the Oʻahu contract with different prices and different products representing Hawaiʻi versus mainland products, was nonresponsive. Consequently, the DOE rejected the bid.

Meadow Gold contends, however, that the DOE was obligated to provide cogent and compelling reasons why the rejection of its offer was in the DOE's best interests. In this regard, Meadow Gold relies upon HAR §§ 3–122–32 and 3–122–95 (1995). HAR § 3–122–32 (1995) provides that the "[c]an-

cellation and rejection of bids shall be pursuant to subchapter 11[,]" which includes HAR §§ 3–122–95 and 3–122–97. HAR § 3–122–95, entitled "Cancellation of solicitations and rejection of offers," provides in relevant part:

> (a) An invitation for bids, a request for proposals, or any other solicitation may be cancelled [sic], or *a bid,* proposal, or any other offer *may* be *rejected in whole or in part as may be specified in the solicitation, in accordance with the provisions of this section.*
>
> (b) The reasons for the cancellation or rejection shall:
>
>> (1) *Include but not be limited to cogent and compelling reasons why the cancellation of the solicitation or rejection of the offer is in the purchasing agency's best interest* . . . .[ [10] ]

(Emphases and footnote added.)

Meadow Gold places misguided reliance upon the permissive language of HAR § 3–122–95 and, apparently, ignores the mandatory language of HAR § 3–122–97, which provides, in pertinent part:

> (a) Bids *shall be rejected for reasons including but not limited to:*
>
>> (1) The bidder that submitted the bid is nonresponsible as determined by subchapter 13;
>>
>> (2) *The bid is not responsive, that is, it does not conform in all material respects to the invitation for bids under the provisions of subchapter 13;* [ [11] ] or
>>
>> (3) The good, service, or construction item offered in the bid is unacceptable by reason of its failure to meet the requirements of the specifications or permissible alternates or other acceptability criteria set forth in the invitation for bids under the provisions of section 3–122–33.

. . . .

---

10. As noted by the hearings officer, HAR § 3–122–95 appears to implement HRS § 103D–308 (1993 & Supp.1997).

11. The reference in HAR § 3–122–97 to subchapter 13 must be in error inasmuch as subchapter 13 addresses the responsibility of prospective bidders, which is largely irrelevant to the responsiveness of the bid.

(d) A notice of rejection shall be sent to the individual offeror advising of the reasons therefor.

(Emphases and footnote added.) Therefore, if Meadow Gold's bid was nonresponsive, the DOE should have rejected the bid and was *not* compelled, under HAR § 3–122–97, to provide cogent or compelling reasons why it was in the DOE's best interests to reject the bid.

1. *Meadow Gold's "Bid" Was Nonresponsive Because Meadow Gold Submitted Multiple Bids in Direct Violation of the Special Conditions of the Bid Solicitation.*

Under HRS § 103D–104 a " '[r]esponsive bidder' means a person who has submitted a bid which conforms in all material respects to the invitation for bids." Accordingly, a bid that does not conform in all material respects to the Bid Solicitation is nonresponsive. However, this begs the question of what constitutes conformance "in all material respects."

Although addressing the United States government's alleged breach of an awarded contract, the United States Court of Claims, in *Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct.Cl. 210, 597 F.2d 1371, 1376–77 (1979), penned a discussion on bid responsiveness that is particularly insightful.

Where a government contract is awarded under competitive bidding, "deviations [from advertised specifications] may be waived by the contracting officer provided they do not go to the substance of the bid or work an injustice to other bidders. *A substantial deviation is defined as one which affects either the price, quantity, or quality of the article offered." Prestex Inc. v. United States,* 320 F.2d 367, 372, 162 Ct.Cl. 620, 627 (1963) (footnote omitted).... Federal procurement regulations incorporate these principles.

When the issue of the "responsiveness of the accepted bid arises after the award, the court should ordinarily impose the binding stamp of nullity only when the illegality is plain" and should "uphold the award unless its invalidity is clear." *John Reiner & Co. v. United States,* 325 F.2d 438, 440, 163 Ct.Cl. 381, 386, 387 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964) (footnote omitted). On the other hand, the government

may disclaim the contract on the ground of voidness *ab initio* because of the non-responsiveness of the bid. Where a public contract is to be let pursuant to formal advertising, the strictures upon defendant's contracting agent are such "that the contract awarded must be the contract advertised and * * * if it is not, the Government is not bound, since defendant's contracting agent could not bind the Government beyond his actual authority." *Prestex Inc. v. United States,* 320 F.2d 367, 371, 162 Ct.Cl. 620, 625 (1963).

*Albano Cleaners, Inc. v. United States,* [455 F.2d 556, 559, 197 Ct.Cl. 450, 455 (1972) ]....

These principles rest upon and effectuate important public policies. "Rejection of [non]responsive bids is necessary if the purposes of formal advertising are to be attained, that is, to give everyone an equal right to compete for Government business, to secure fair prices, and to prevent fraud." *Prestex, Inc. v. United States, supra,* 320 F.2d at 372, 162 Ct.Cl. at 626 (footnote omitted). The requirement that a bid be responsive is designed to avoid unfairness to other contractors who submitted a sealed bid on the understanding that they must comply with all of the specifications and conditions in the invitation for bids, and who could have made a better proposal if they imposed conditions upon or variances from the contractual terms the government had specified. The rule also avoids placing the contracting officer in the difficult position of having to balance the more favorable offer of the deviating bidder against the disadvantages to the government from the qualifications and conditions the bidder has added. In short, the requirement of responsiveness is designed to avoid a method of awarding government contracts that would be similar to negotiating agreements but which would lack the safeguards present in either that system or in true competitive bidding. *See* R.

Nash & J. Cibinic, *Federal Procurement law*, 260 (3d Ed.1977).

> *Responsiveness is determined by reference to when they are opened and not by reference to subsequent changes in a bid. Id.* at 261. *Allowing a bidder to modify a nonresponsive bid when, upon opening the bids, it appears that the variations will preclude an award, would permit the very kind of bid manipulation and negotiation that the rule is designed to prevent.* Otherwise bidders would be encouraged to submit nonresponsive bids on terms favorable to the government but subject to certain conditions, in the hope that if their bids were the top ones, they could then negotiate about and retain some of their proposed changes. In this way they could obtain a contract that they could not have received had they complied with the specification in the invitation for bids.

*Id.* (ellipsis in original) (footnote omitted) (brackets and emphases added). *See also Northeast Constr. Co. v. Romney*, 485 F.2d 752, 758–59 (D.C.Cir.1973) ("And whether a bid complies in all material respects with the invitation depends on whether the method and timeliness of submission maintains the integrity of the procurement system." (Citing 41 C.F.R. § 1–2.301 (Sept. 24 1965).)); *Blount, Inc. v. United States*, 22 Cl.Ct. 221, 226–27 (1990) ("[A] bid which contains a material nonconformity must be rejected as nonresponsive.... Material terms and conditions of a solicitation involve price, quality, quantity, and delivery." (Citation omitted.)); *Firth Constr. Co. Inc. v. United States*, 36 Fed. Cl. 268, 272, 274, 275 (1996); *cf. ECDC Envtl. L.C. v. United States*, 40 Fed.Cl. 236, 242 (1998) (citing *Firth* and *Prestex, supra,* but applying a standard of review akin to abuse of discretion). Further,

> [c]ontracting is a sentient process. There must be objective proof of a meeting of the minds. The prospective contracting parties are not expected to engage in telepathy. There must be a confluence of assent around specific terms. For that reason, ... a bid which is ambiguous must be rejected as non-responsive.

*Firth Constr. Co., Inc.*, 36 Fed.Cl. at 276 (citation omitted).

It is undisputed that Meadow Gold submitted two OF–3 bid sheets for the Oʻahu contract. The record reveals that Meadow Gold's initial response to the DOE's rejection of its "bid" was to explain its intentions behind submitting the "two bids." When that argument failed, Meadow Gold then argued that it did not submit two bids, but that it submitted an integrated bid, which is not expressly prohibited. However, the above discussion of the relevant statutory provisions and attending rules demonstrates that submission of a multiple bid is prohibited.

It is elementary that submission of two bids in a sealed competitive bidding process that permits submission of only one bid is a material deviation from the Bid Solicitation special conditions and is nonresponsive. Moreover, Meadow Gold's deviation directly involved the *price*, a term that is typically and traditionally material. Furthermore, Meadow Gold's double bid was ambiguous. As noted above, the DOE is not required to engage in telepathy to discern what Meadow Gold intended by submitting two apparently different bids.[12] Meadow Gold's multiple or double bid was nonresponsive to the instant Bid Solicitation and was properly rejected.

### 2. *Meadow Gold's Argument that It Submitted an Integrated Bid Lacks Merit.*

Meadow Gold has complicated the seemingly simple question of whether it submitted two bids. Meadow Gold argues that, if the 10% price preference for Hawaiʻi products is calculated, the figures on the two OF–3 bid sheets are equivalent. Meadow Gold's argument fails for three reasons.

First, the question whether Meadow Gold submitted a "multiple bid" in violation of special conditions Nos. 2A.1 and 2A.10 and HAR § 3–122–4 presents a mixed question of law and fact. "When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field.... '[T]he court should not substitute its own

---

**12.** It is noted again that Meadow Gold did not specify a primary bid.

judgment for that of the agency.' " *Poe,* 87 Hawai'i at 195, 953 P.2d at 573 (citations omitted). As the DOE immediately determined upon opening the bids that Meadow Gold had submitted a "multiple bid" by submitting two OF–3 pages with different prices and products, we defer to the DOE's determination on this issue.

Second, condition No. 1C.2 of the special conditions to the Bid Solicitation provides that no preference will be given, *i.e.,* no 10% reduction will be calculated, when all of the bids submitted consist of Hawai'i products. Here, only Meadow Gold and Foremost submitted bids for the O'ahu contract, both of which contained Hawai'i products. Meadow Gold's submission of an impermissible second OF–3 page containing non-Hawai'i products will not render the preference provision applicable.

Third and finally, even assuming that the 10% preference is calculated, the prices are not equivalent. Meadow Gold submitted exhibits to the hearings officer adding 10% to its OF–3 page containing non-Hawai'i products and rounded those figures up to equal the prices on its OF–3 page containing Hawai'i products prices. The plain language of HRS § 103D–1002 (Supp.1998)[13] provides that 10% will be *subtracted* from the Class III Hawai'i products price. This is important insofar as no "rounding" of figures properly calculated would render the two OF–3 pages equivalent.[14] Therefore, Meadow Gold's argument that the DOE improperly rejected its bid because its bid was "integrated" is meritless.

## B. *The DOE Was Not Obligated to Permit Meadow Gold to Correct Its "Mistake."*

■■■ Meadow Gold argues that the DOE should have permitted Meadow Gold to correct its mistake of basically submitting two bids, despite its argument that it submitted an integrated bid.

HAR § 3–122–31 (1995) provides:

*Mistakes in bids.* (a) Correction or withdrawal of a bid because of an obvious mistake in the bid is permissible to the extent it is not contrary to the best interest of the government agency or to the fair treatment of other bidders.

. . . .

(c) Corrections to bids after opening but prior to award may be made under the following conditions:

(1) If the mistake is attributable to an arithmetical error, the procurement officer shall so correct the mistake. In case of error in extension of bid price, unit price shall govern.

(2) If the mistake is a minor informality which shall not affect price, quantity,

---

**13.** HRS § 103D–1002 provides in relevant part:

**Hawai'i products.** (a) A purchasing agency shall review all specifications in a bid or proposal for purchase from the Hawai'i products list where these products are available; provided that the products:

. . . .

(d) Where a bid or proposal contains both Hawai'i and non-Hawai'i products, then for the purpose of selecting the lowest bid or purchase price only, the price bid or offered for a Hawai'i product item shall be decreased by *subtracting* therefrom: . . . ten per cent for . . . class III Hawai'i product items bid or offered, respectively. The lowest total bid or proposal, taking the preference into consideration, shall be awarded the contract unless the bid or offer provides for additional award criteria. . . .

**14.** As one can see, rounding the figures of Meadow Gold's first OF–3 page, after the 10% price preference, does not equal Meadow Gold's second OF–3 page figures.

Meadow Gold's 1ST OF–3 page of Hawai'i products:

| Group 1 | Group 2 | Group 3 | Group 4 | Group 5 | Group 6 | Group 7 | Group 8 |
|---------|---------|---------|---------|---------|---------|---------|---------|
| $.26 | $.25 | $.235 | $.24 | $.24 | $.26 | $.26 | $.26 |

Meadow Gold's 2ND OF–3 page of non-Hawai'i products:

| Group 1 | Group 2 | Group 3 | Group 4 | Group 5 | Group 6 | Group 7 | Group 8 |
|---------|---------|---------|---------|---------|---------|---------|---------|
| $.236363 | $.227272 | $.213636 | $.218181 | $.218181 | $.236363 | $.236363 | $.236363 |

Meadow Gold's 1ST OF–3 page of Hawai'i products lessened 10%:

| Group 1 | Group 2 | Group 3 | Group 4 | Group 5 | Group 6 | Group 7 | Group 8 |
|---------|---------|---------|---------|---------|---------|---------|---------|
| $.234 | $.225 | $.2115 | $.216 | $.216 | $.234 | $.234 | $.234. |

quality, delivery, or contractual conditions, the procurement officer may waive the informalities or allow the bidder to request correction by submitting proof of evidentiary value which demonstrates that a mistake was made. The procurement officer shall prepare a written approval or denial in response to this request. Examples of mistakes include:

(A) Typographical errors;

(B) Transposition errors;

(C) Failure of a bidder to sign the bid or provide an original signature, but only if the unsigned bid or photocopy is accompanied by other material indicating the bidder's intent to be bound.

(3) *If the mistake is not allowable under paragraphs (1) and (2), but is an obvious mistake that if allowed to be corrected or waived is in the best interest of the government agency or for the fair treatment of other bidders, and the chief procurement officer or the head of the purchasing agency concurs with this determination, the procurement officer shall correct or waive the mistake.*

. . . .

(f) The determination required by this section shall be final and conclusive unless they are clearly erroneous, arbitrary, capricious, or contrary to law.

(Emphasis added.)

■ Correction of a mistake that is neither an arithmetical error or a minor informality must be in the best interests of the DOE. However, "[q]uestions of the 'responsiveness' of [a] bid . . . relate to 'conformity with the invitation' and are generally not curable after bid opening." *Northeast Constr. Co.*, 485 F.2d at 760. The discretion of the head of the DOE in concurring with such determinations "shall be final and conclusive unless they are clearly erroneous, arbitrary, capricious, or contrary to law."

As noted above, such a correction in the instant case would not have been in the best interests of the DOE, inasmuch as it would have been unfair to the other bidder. Similar to *Northeast Constr. Co.*, 485 F.2d at 760, "the specifications furnished [Meadow Gold] were clear and specific, and they were ignored. [Meadow Gold] cannot realistically be heard to say that [it] was relying on the minor irregularities clause of [HAR § 3–122–31]. If [Meadow Gold] knew much about government procurement, [Meadow Gold] knew enough to know that [it] was governed by the" special conditions of the Bid Solicitation. On this record, there was no abuse of discretion.

**C. *Meadow Gold's Challenges to the Hearings Officer's Decisions Are without Merit.***

**1. *The Hearings Officer Correctly Excluded Evidence Irrelevant to the Responsiveness of Meadow Gold's Bid.***

Meadow Gold argues that the hearings officer erred in excluding evidence regarding the best interests of the DOE and regarding its intent to submit an integrated bid. The DOE and Foremost contend that this evidence was properly excluded as irrelevant. We agree with the DOE and Foremost.

HRE Rule 402 provides that "[a]ll relevant evidence is admissible. . . . Evidence which is not relevant is not admissible." " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401 (1993).

■ The above discussion regarding responsiveness makes clear that the best interests of the DOE as well as the savings the DOE would have received are irrelevant, insofar as applicable statutory provisions and rules mandated the rejection of Meadow Gold's multiple bid. Meadow Gold focuses upon the speculative savings the DOE lost and ignores how its actions nearly compromised the integrity of the competitive bidding system.

In fact, the DOE's conclusion that Meadow Gold's bid must have been rejected *was in the best interests of the DOE* for two reasons. First, rejection of a bid that does not materially conform to the special conditions of a bid

solicitation maintains the competitive bidding system's integrity by insuring fairness to other bidders. The hearings officer correctly concluded that the DOE's failure to reject Meadow Gold's bid would have been unfair to the other bidder, here Foremost. Second, any contract that the DOE might have entered with Meadow Gold, based upon its bid for the instant contract, would likely have been void in light of Meadow Gold's material deviation from the special conditions of the Bid Solicitation.

Finally, Meadow Gold's evidence of its intent to submit an integrated bid was similarly irrelevant. As noted above, responsiveness is determined when the bids are opened. Neither Meadow Gold, nor any bidder, can be permitted to explain, after the bids are opened, how its bid is responsive, despite the bid's apparent nonresponsiveness. The hearings officer correctly excluded this evidence.

2. *The Hearings Officer Did Not Prejudice Meadow Gold's Substantial Rights.*

Meadow Gold argues that the hearings officer prejudiced its substantial rights by (1) scheduling the May 13, 1998 hearing without prior legal notice, (2) making no attempt to contact Meadow Gold and insure that it was aware of the hearing, (3) granting Foremost's motion to intervene without hearing from Meadow Gold, (4) granting the DOE's oral motion to dismiss, (5) failing to rule on the DOE's motion to reschedule the hearing and then permitting the DOE to withdraw its motion, and (6) entering its July 16, 1998 FOFs, COLs, and judgment on the same day the DOE awarded the contract in dispute. In short, Meadow Gold's arguments are without merit.

First, the record reveals that the May 13, 1998 hearing was held after notice was given, albeit short notice, to both the DOE and Meadow Gold. Foremost's motion to intervene was properly granted, and Meadow Gold has offered no argument as to why the next lowest bidder on the challenged contract would not have a right to intervene. Further, although the first hearing was held without Meadow Gold's presence on May 13, 1998, the hearings officer, upon an appropriate motion for reconsideration, withdrew its order dismissing the matter without prejudice and re-set the matter for another hearing. A full administrative hearing was held on the matter on June 15, 1998.

Second, Meadow Gold's argument that, essentially, the hearings officer was biased and failed to act impartially is without merit. Rulings that are in the opposing party's favor do not equal a lack of impartiality. In light of the foregoing, Meadow Gold's argument fails.

Third and finally, Meadow Gold's cryptic challenge to the hearing officer's entering judgment on July 16, 1998, the same day the DOE awarded the contract to Foremost, also lacks merit. Meadow Gold appears to be alleging that some form of collusion existed between the hearings officer and the DOE. A thorough review of the record on appeal shows that this implicit argument has no factual basis. Furthermore, nothing in HRS Chapter 103D precludes an agency from executing such a contract on the same day that the hearings officer enters judgment. Therefore, Meadow Gold's substantial rights have not been prejudiced.

## IV. *CONCLUSION*

Based upon the foregoing, the DOE's rejection of Meadow Gold's bid was in accordance with the Constitution, statutes, regulations, and the terms and conditions of the Bid Solicitation. Therefore, the DCCA hearings officer's decision correctly affirmed the DOE's rejection of the bid and is hereby affirmed.