Electronically Filed
Intermediate Court of Appeals
30488
29-APR-2013
10:35 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---oOo---

INTERNATIONAL DISPLAY SYSTEMS, INC., Appellant-Appellant,
vs.
GLENN M. OKIMOTO, DIRECTOR, DEPARTMENT OF TRANSPORTATION, STATE
OF HAWAI'I; FORD N. FUCHIGAMI, DEPUTY DIRECTOR, DEPARTMENT OF
TRANSPORTATION, AIRPORTS DIVISION; DESIGNEES OF AARON S. FUJIOKA,
ADMINISTRATOR, STATE PROCUREMENT OFFICE, STATE OF HAWAI'I; FORD
AUDIO-VIDEO SYSTEMS, INC.; DEPARTMENT OF COMMERCE AND CONSUMER
AFFAIRS, Appellees-Appellees,
and
JOHN DOES 1-10; JANE DOES 1-10; DOE GOVERNMENTAL UNITS 1-10; AND
DOE ENTITIES 1-10, Appellees.

NO. 30488

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CV NO. 09-1-2244)

APRIL 29, 2013

NAKAMURA, CHIEF JUDGE, AND FOLEY AND FUJISE, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

This appeal arises out of a request for proposals
issued by the State of Hawai'i (State), Department of

Transportation-Airports Division (DOTA),[1] to provide new passenger information systems for the Kahului Airport (Kahului Airport Project). In response to the request for proposals, two companies, International Display Systems, Inc. (IDS) and Ford Audio-Video Systems, Inc. (Ford), submitted proposals. The DOTA rated Ford's proposal above IDS's proposal and awarded the contract for the Kahului Airport Project to Ford. IDS filed a protest of the contract award to Ford, which was denied by the DOTA. IDS then filed a request for administrative hearing on its protest before the Office of Administrative Hearings (OAH) of the State Department of Commerce and Consumer Affairs (DCCA).

Before a hearing was held on the merits of IDS's protest before the OAH, the DOTA in May 2009 cancelled the Kahului Airport Project and the contract awarded to Ford. The DOTA explained that due to the declining economy, there were insufficient funds to cover all of the DOTA's capital improvement projects, and the DOTA had decided to cancel the Kahului Airport Project, which it ranked as among its lower priority projects. The DOTA moved to dismiss IDS's request for an administrative hearing on its protest based on the cancellation of the Kahului Airport Project.

The OAH hearings officer granted the motion and dismissed IDS's request for an administrative hearing. The hearings officer determined that the DOTA had cancelled the solicitation for the Kahului Airport Project due to budget constraints related to "the current financial crisis" and that "there was no evidence that the cancellation was motivated by an improper purpose." IDS sought judicial review of the hearings officer's decision before the Circuit Court of the First Circuit

_____

[1] For simplicity, we will use "DOTA" to refer not only to the State Department of Transportation-Airports Division, but also to include the State Department of Transportation, the Director of the State Department of Transportation, and the Deputy Director of the State Department of Transportation-Airports Division.

(Circuit Court).[2/]  The Circuit Court affirmed the hearings officer's decision to dismiss IDS's request for an administrative hearing on its protest, although on different grounds.

The question raised by this appeal is whether despite DOTA's cancellation of the Kahului Airport Project and the underlying solicitation for the project, IDS was entitled to have the hearings officer rule on the merits of its protest so that IDS could pursue its claim for proposal preparation costs and attorney's fees.  We conclude, under the circumstances of this case, where IDS did not demonstrate that the DOTA acted in bad faith or arbitrarily and capriciously in cancelling the Kahului Airport Project, that the answer to this question is no.  We therefore affirm the Circuit Court's Final Judgment entered against IDS.

BACKGROUND

I.

On May 7, 2008, the DOTA issued a Request for Proposals to Provide New Passenger Information Systems For Kahului Airport, Project No. AM1042-29R (RFP).  The RFP for the Kahului Airport Project sought proposals for new passenger information systems for Kahului Airport, including a flight information display system, a public address system, and a gate management system. IDS and Ford submitted proposals, which were close in terms of cost.  IDS's proposal was in the amount of $5,104,898.47, and Ford's proposal was in the amount of $5,161,731.00.  Both proposals met the mandatory requirements of the RFP.  Although IDS's proposal was for a slightly lower cost than Ford's proposal, the DOTA ranked Ford's proposal as the best proposal and IDS's proposal as the second best based on evaluation criteria that included approach, company experience, and cost.

---

[2/] The Honorable Eden Elizabeth Hifo presided over the proceedings relevant to this appeal.

Pursuant to this evaluation, DOTA awarded the contract for the RFP to Ford for $5,161,731.00.[3/]

II.

On September 3, 2008, IDS protested the award of the contract to Ford. Among other things, IDS contended that the DOTA had failed to conduct a reasonable cost or price analysis of Ford's proposal as required by the applicable administrative rules and that Ford's proposal improperly restricted disclosure of purchasing information. The DOTA denied IDS's protest.

III.

A.

On October 10, 2008, IDS requested an administrative review hearing on its protest before the OAH.[4/] IDS requested, among other things: (1) the termination of the contract awarded to Ford; (2) the award of the contract to IDS because its proposal was rated second to Ford's proposal; (3) if the contract is not awarded to IDS, that IDS be awarded its proposal preparation costs; and (4) IDS be awarded attorney's fees and costs of the proceeding. Ford filed a motion to intervene in the proceeding which the OAH hearings officer granted. The hearing on IDS's protest was delayed by disputes over the extent to which IDS was entitled to disclosure of pricing information on which Ford's proposal was based, which Ford asserted was confidential. Eventually, a hearing on IDS's protest was scheduled for May 21, 2009.

---

[3/] The DOTA had previously awarded a contract to Ford in February 2008, under a prior request for proposals to provide new passenger information systems at Kahului Airport (Prior RFP). However, IDS filed a protest of this award, and in response to IDS's protest, the DOTA cancelled the Prior RFP, citing technical deficiencies in the Prior RFP. IDS does not challenge the DOTA's actions in cancelling the Prior RFP in this appeal.

[4/] Named as "Respondents" in IDS's "Request for Hearing" before the OAH were the Director of the State Department of Transportation and the Deputy Director of the State Department of Transportation-Airports Division, as designees of the Administrator of the State Procurement Office, who we will collectively refer to as the "DOTA."

However, shortly before the scheduled hearing date, the DOTA cancelled the Kahului Airport Project and terminated its contract with Ford. By letter dated May 11, 2009, the DOTA informed Ford that

> [d]ue to the declining economy, projects at the Airports Division, Department of Transportation, that have not yet been issued Notices to Proceed are being reprioritized and we regret to inform you that the contract with [Ford] for the [Kahului Airport Project] is terminated. [The DOTA] hopes to issue a new competitive bid for a modified project with a reduced scope in the near future.

By letter dated May 13, 2009, the DOTA advised IDS that "[d]ue to current budget constraints which will require substantial project modifications, we regret to inform you that all bids submitted for the subject project have been rejected. . . . We plan to redesign the project and advertise it at a later date."

On May 15, 2009, the DOTA notified the OAH hearings officer that it "has cancelled the [Kahului Airport Project] due to budget constraints and reprioritization of Airports Division projects." The DOTA also notified the hearings officer of its request for a status conference to discuss procedures for dismissing the case. IDS responded with a letter to the hearings officer dated May 18, 2009, arguing that the DOTA's decision to terminate "the contract" was "unnecessary and in bad faith." IDS informed the hearings officer that it planned to oppose the DTOA's motion to dismiss the case. The May 21, 2009, hearing on the merits of IDS's protest was taken off the calender.

The DOTA and IDS agreed that IDS would not be required to file an additional, separate protest of the DOTA's cancellation/termination of the Kahului Airport Project, but could raise any issues and claims stemming from the cancellation/termination in the ongoing administrative proceeding. In preparation for the DOTA's filing of its motion to dismiss, IDS served subpoenas duces tecum on the DOTA for documents relating to the DOTA's decision to cancel the Kahului Airport Project and terminate the contract to Ford. The DOTA produced documents in response to the subpoenas deces tecum. In

5

addition, Jeffrey Chang (Chang), the Engineering Program Manager for the DOTA who was involved in the decision to cancel the Kahului Airport Project, testified when the subpoenas duces tecum were returned.

B.

On July 7, 2009, the DOTA filed a motion to dismiss IDS's request for an administrative hearing on IDS's protest of the award of the contract to Ford. The DOTA explained its decision to cancel the Kahului Airport Project as follows:

> Due to the declining economy in the State, and the corresponding decline in funding for Airports capital improvement projects, DOT Airports Division has been using its available funding to finish up projects that have already started and also for projects with the highest priority, i.e., the projects involving safety and/or security, and projects mandated by State or federal law. The cash balance for the Airports Division capital improvement projects is insufficient to cover all of the planned and pending projects. Accordingly, Engineering Program Manager Jeff Chang was forced to cancel several projects with lower priority, which included [the Kahului Airport Project]. . . .
>
> On June 2, 2009, Jeff Chang and DOT Airports Fiscal Officer Ross Higashi testified at the return hearing on two subpoenas duces tecum for records concerning this project and the subsequent decision to cancel the project. As Mr. Chang testified, the DOT Airports Division could not proceed with the steps to encumber funds specifically for this project because of the stay imposed by the filing of the bid protest. Due to the economic downturn and the limited availability of funding for Airports capital improvement projects, Mr. Chang made the decision to cancel several projects that were low in priority and had not yet commenced.
>
> In prioritizing its capital improvement projects, DOT Airports Division follows specific written guidelines. Projects involving security or safety are given the highest priority, followed by projects mandated by State or federal law. [The Kahului Airport Project], although desirable for passenger convenience, is not mandated for security or safety reasons and is not required by State or federal law. From the time that the stay was imposed by the filing of the bid protest until the present, [the Kahului Airport Project] was superseded by five other higher priority projects.
>
> [The Kahului Airport Project] covered three systems--the flight information display system ("FIDS"), the public announcement system ("PA"), and the gate management system ("GMS") at Kahului Airport. Cancellation of the project enables DOT Airports to readvertise for one of the systems, depending upon future economic conditions and funding availability,

and also depending upon which system, FIDS or PA,
needs replacement first. The GMS system is lower
priority than the FIDS or PA systems and, therefore,
will not be advertised.

(Citations omitted.)

In support of its explanation, the DOTA cited the Declaration of Chang, which was attached to the motion, and Chang's testimony at the return hearing. In his Declaration, Chang, stated that as the Engineering Program Manager for the DOTA, his duties include prioritizing capital improvement projects for all airports in Hawai'i based on available funding and on established guidelines for prioritization of airport projects. Chang stated that: (1) the Kahului Airport Project was cancelled "due to budget constraints" and the decision to cancel was based on the lack of sufficient funds for airport capital improvement projects, the fact that work had not commenced on the project, and the fact that the project was lower in priority than other projects; (2) the current balance in the Airports fund is insufficient to cover all the planned and pending capital improvement projects; (3) under the DOTA's prioritization guidelines, the Kahului Airport Project was not a high priority project because it is "for passenger convenience and is not required for safety and/or security and is not required by State and federal law"; (4) other projects were being cancelled for the same reasons; (5) due to the stay placed on the project by IDS's bid protest, the appropriate steps to encumber funds for the project could not be taken; (6) after the stay went into effect, five new projects have superseded the Kahului Airport Project in priority; and (7) Chang made the decision to cancel rather than defer the Kahului Airport Project because of the uncertainty of future economic conditions of the Airports Division and uncertainty over whether the flight information display system or the public announcement system would need replacement first, with the DOTA deciding not to seek rebids for the gate management system.

7

The DOTA argued that the cancellation of the Kahului Airport Project and the termination of the contract with Ford rendered IDS's bid protest moot, because "there is no project and no contract to be awarded[.]" The DOTA further argued that for the reasons set forth in Chang's declaration and testimony, the DOTA's decision to cancel the Kahului Airport Project and the solicitation was a valid exercise of its discretion, was in the best interests of the government, and had a reasonable basis.

IDS filed a memorandum in opposition to the DOTA's motion to dismiss. IDS argued that the cancellation of the Kahului Airport Project and termination of Ford's contract did not render its protest moot. Although acknowledging that its request to terminate Ford's contract was moot, IDS contended that its request for recovery of proposal costs and the award of attorney's fees could still be resolved in its favor and prevented its protest from being moot. IDS also argued that the DOTA's termination of the contract for the Kahului Airport Project was unjustified, improper, and "an act of bad faith." IDS disputed the DOTA's assertion that the cancellation of the Kahului Airport Project was justified by the lack of funds and need to prioritize projects. IDS argued that the cancellation was done for the purpose of rendering its protest moot and that the DOTA's actions violated the stay imposed under Hawaii Revised Statutes (HRS) § 103D-701(f) (2012).[5]

C.

After holding a hearing on the DOTA's motion to dismiss and considering the evidence and arguments presented, the hearings officer granted the DOTA's motion to dismiss, and he issued his "Findings of Fact, Conclusions of Law, and Order Granting [the DOTA's] Motion to Dismiss [IDS's] Request for

---

[5] HRS § 103D-701(f) provides, in pertinent part, that "in the event of a timely protest . . . , no further action shall be taken on a solicitation or award of the contract until the chief procurement officer makes a written determination that the award of the contract without delay is necessary to protect substantial interests of the State."

8

Administrative Hearing" (Order Granting Motion to Dismiss). In his findings of fact, the hearings officer cited Chang's Declaration and Chang's testimony at the return hearing, as follows:

> 56. Chang also testified at the June 2, 2009 return and in his July 6, 2009 declaration that although the Legislature appropriated funds for the [Kahului Airport] Project, those funds are not encumbered for the [Kahului Airport] Project until after the contract is executed by all parties, approved by the Department of the Attorney General, and [the Department of Transportation's (DOT)] Contracts Office routes the contract, the Batch Slip, and the C-41 form to the Department of Accounting & General Services ("DAGS") and DAGS posts the C-41 form for the [Kahului Airport] Project. According to Chang, due to the stay placed on the solicitation for the [Kahului Airport] Project by the filing of [IDS's] protest, the Airports Fiscal Office had not yet prepared the C-41 form and accompanying documents for transmittal to [the DOT's] Contracts Office and thus, the funds were not encumbered for the [Kahului Airport] Project.

> 57. Chang testified that the total cash balance available for [the DOTA] projects was insufficient to cover all of the current and pending projects, including the [Kahului Airport] Project. Chang also testified that the [DOTA] is in a serious cash crunch because of several factors including the bankruptcies of several airlines and the current financial crisis. According to Chang, he applied the written guidelines that had been developed by his predecessor in prioritizing Airports projects and in determining which projects would be continued and which would be deferred or closed.

> 58. According to the written guidelines, projects involving safety and/or security are ranked first in priority, projects mandated by State or federal law are ranked second in priority, projects to repair and preserve the facilities are ranked third, projects for utilities or systems are ranked fourth, projects for functional improvements to existing facilities are ranked fifth, projects for expansion or capacity enhancement are ranked sixth, and projects to enhance business ventures to generate revenues such as concessions and fixed based facilities are ranked seventh.

> 59. Chang testified that the [Kahului Airport] Project, which involved information systems for passengers, was ranked third in priority according to the written guidelines. Chang also testified that only projects that are first or second in priority according to the written guidelines are moving forward because [the DOTA] would be subject to fines if those projects were not implemented.

> 60. Chang further testified that the [Kahului Airport] Project was placed on the list of projects to be deferred or closed because of its lower priority and that the passenger information systems project would be done in phases as funds for Airports CIP projects become available.

9

In accordance with Chang's declaration and testimony, the hearings officer determined that the

> evidence established that [the DOTA] cancelled the solicitation for the [Kahului Airport] Project due to budget constraints related to, among other things, the current financial crisis. According to the evidence, [the DOTA] would not be able to fund all of its capital improvement projects unless or until its revenues improved. As a result, [the DOTA] applied its internal written guidelines to prioritize its projects and determined which projects would be deferred or closed. Only projects determined to be first and second in priority under the guidelines would move forward in order to avoid the imposition of penalties. The [Kahului Airport] Project was ranked third in priority under [the DOTA's] written guidelines. Consequently, the [Kahului Airport] Project was placed on a list of projects to be deferred or closed until revenues improved.

In other words, the hearings officer adopted the DOTA's explanation for its cancellation of the Kahului Airport Project. The hearings officer also specifically determined that "there was no evidence that the cancellation was motivated by an improper purpose." (Footnote omitted.) The hearings officer ruled that notwithstanding a pending protest and the stay imposed by HRS § 103D-701(f), a solicitation may be cancelled when the government's best interests are served by the cancellation. Based on the record, the hearings officer concluded that the government's best interests were served by the cancellation of the Kahului Airport Project and, accordingly, the DOTA was entitled to cancel the project.

The hearings officer rejected IDS's argument that despite the cancellation of the Kahului Airport Project, IDS was entitled to recover the bid preparation costs[6] it incurred in connection with the solicitation. The hearings officer noted that HRS § 103D-701(g) provides:

> In addition to any other relief, when a protest is sustained and the protestor should have been awarded the contract under the solicitation but is not, then the protestor shall be entitled to the actual costs reasonably

---

[6] The terms "bid preparation costs" and "proposal preparation costs" were used interchangeably in the underlying proceedings, and we will do the same in this opinion.

> incurred in connection with the solicitation, including bid
> or proposal preparation costs but not attorney's fees.

The hearings officer ruled that HRS § 103D-701(g) "must be construed along with HRS § 103D-308 [(2012)]."[1] He interpreted HRS § 103D-308 as authorizing the government to cancel a solicitation when the cancellation is in the government's best interest and, in that situation, not permitting the low bidder to recover any of its bid preparation costs. The hearings officer could "find no reasonable justification for allowing a successful protestor to recover its bid preparation costs even though the solicitation is properly cancelled pursuant to HRS § 103D-308 while denying the same relief to a low bidder who would have been awarded the contract but for the cancellation."

The hearings officer concluded that "where a solicitation is properly cancelled under HRS § 103D-308, a protestor is not entitled to recover its bid preparation costs." Based on his determination that the DOTA had properly cancelled the Kahului Airport Project in the government's best interests, the hearings officer concluded that IDS was not entitled to recover its bid preparation costs. The hearings officer also rejected IDS's request for attorney's fees based on his determination that the DOTA's cancellation of the Kahului Airport Project was proper and did not violate the HRS § 103D-701(f) stay provision.

---

[1] HRS § 103D-308 provides:

> An invitation for bids, a request for proposals, or other solicitation may be canceled, or any or all bids or proposals may be rejected in whole or in part as may be specified in the solicitation, when it is in the best interests of the governmental body which issued the invitation, request, or other solicitation, in accordance with rules adopted by the policy board. The reasons therefor shall be made part of the contract file.

IV.

IDS appealed the hearings officer's Order Granting Motion to Dismiss to the Circuit Court.[8]  IDS argued that: (1) the "solicitation" relating the Kahului Airport Project ended when the DOTA awarded the contract to Ford, and therefore the hearings officer erred in construing the DOTA's termination of the contract awarded to Ford as a cancellation of the solicitation under HRS § 103D-308; and (2) the hearings officer compounded his error by applying the limited scope of remedies available for the pre-award cancellation of a solicitation under HRS § 103D-308 in concluding that IDS had no protest remedies under HRS § 103D-701(g) post-award.

After considering the briefs presented by IDS and the DOTA and hearing oral argument, the Circuit Court affirmed the hearings officer's Order Granting Motion to Dismiss.  The Circuit Court issued an order affirming the Order Granting Motion to Dismiss, which stated in pertinent part as follows:

> The subject dismissal in this matter is affirmed.  The Court determined the dismissal was the correct result even if for the wrong reason.  Assuming H.R.S. Section 103D-308 is not the correct basis for the dismissal, the Court determines that the appeal should be dismissed as moot or because, on the record, any contract awarded to Ford or to [IDS] (if [IDS] prevailed on remand on its protest) would "neither be binding nor have any force and effect of law" pursuant to H.R.S. Section 103D-309.[9]

> Finally, this Court rejects [IDS's] argument that the law requires a remand and determination below on the merits

---

[8] Named as "Appellees" in IDS's appeal to the Circuit Court were the Respondents in the OAH proceeding, see supra note 4, the DCCA, and Ford.  Ford did not enter an appearance before the Circuit Court.

[9] HRS § 103D-309(a) (2012) states in pertinent part:

> Contracts awarded pursuant to section 103D-302, 103D-303, or 103D-306, shall neither be binding nor have any force and effect of law unless the comptroller, the director of finance of a county, or the respective chief financial officers of the department of education, the judiciary, or the legislative branches of the State or county, as the case may be, endorses thereon a certificate that there is an appropriation or balance of an appropriation over and above all outstanding contracts, sufficient to cover the amount required by the contract[.]

> of the protest when the state has no funds to pay for the contract and has cancelled the Ford contract. To adopt [IDS's] argument on this record would cause an absurd result which is anathema to proper statutory construction.

On May 3, 2010, the Circuit Court issued its Final Judgment against IDS and in favor of the DOTA and the DCCA. This appeal followed.

## STANDARDS OF REVIEW

This is a secondary appeal of the Circuit Court's review of the hearings officer's decision under the Hawai'i Public Procurement Code, HRS Chapter 103D. We review the Circuit Court's decision *de novo*, utilizing the same standards set forth in HRS § 103D-710(e) (2012) for circuit court review of the hearings officer's decision. Bombardier Transp. (Holdings) USA Inc. v. Director, Dep't of Budget and Fiscal Servs., 128 Hawai'i 413, 417, 289 P.3d 1049, 1053 (App. 2012); United Pub. Workers, AFSCME, Local 646, AFL-CIO, v. Hanneman, 106 Hawai'i 359, 363, 105 P.3d 236, 240 (2005). Under HRS § 103D-710(e), the circuit court, based on review of the record,

> may affirm the decision of the hearings officer issued pursuant to section 103D-709 or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if substantial rights may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the chief procurement officer or head of the purchasing agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"[C]onclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection

(3); findings of fact under subsection (5); and the Hearings Officer's exercise of discretion under subsection (6)." CARL Corp. v. State, Dep't of Educ., 85 Hawai'i 431, 446, 946 P.2d 1, 16 (1997) (hereinafter, "CARL I") (block quote format, brackets in original, and citation omitted).

> "A [conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. "The court should not substitute its own judgment for that of the agency."

Southern Foods Group, L.P. v. State, Dep't of Educ., 89 Hawai'i 443, 452, 974 P.2d 1033, 1042 (1999) (brackets in original and citations omitted). "A hearings officer abuses his or her discretion when he or she 'clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.'" Id. (citation omitted). Moreover,

> [I]n order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, *a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise* and one seeking to upset the order bears the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

Id. at 453, 974 P.2d at 1043 (emphasis in original; citation omitted).

DISCUSSION

I.

IDS argues that the DOTA violated HRS § 103D-701(f) by cancelling the Kahului Airport Project and terminating the DOTA's contract with Ford while IDS's protest was still pending. We disagree.

HRS § 103D-701(f) provides that in the event of a timely protest of the solicitation or award of a contract, "no further action shall be taken on the solicitation or the award of the contract until the chief procurement officer makes a written

determination that the award of the contract without delay is necessary to protect substantial interests of the State." The focus of HRS § 103D-701(f) is to stop the project from moving forward, subject to the exception that the State is permitted to proceed with the project where delay would harm its substantial interests. The Hawai'i Supreme Court has explained that the purpose of HRS § 103D-701(f) is to prevent work on the project from proceeding to the point where the availability of effective remedies are precluded by expense and impracticality. CARL I, 85 Hawai'i at 453, 946 P.2d at 23. In discussing HRS § 103D-701(f), the court stated that "[b]y maintaining the status quo during the pendency of a protest, violations of the procurement code can be rectified before the work on the contract has proceeded so far that effective remedies, for the protestor and the public, are precluded by expense and impracticality." CARL I, 85 Hawai'i at 453, 946 P.2d at 23.

We construe the phrase "no further action shall be taken on the solicitation or the award of the contract" in HRS § 103D-701(f) as precluding actions in furtherance of establishing or completing the contract, and not actions to terminate or cancel the contract. Our interpretation is consistent with the supreme court's view that HRS § 103D-701(f) was designed to prevent work on the project from proceeding so far that effective remedies were prevented due to expense and impracticality. Termination of an awarded contract does not implicate the concerns that HRS § 103D-701(f) was designed to address.

One of the principal remedies available to an unsuccessful bidder is to terminate the contract that has been awarded to the winning bidder. Indeed, that was the principal remedy sought by IDS in filing its protest. It would be anomalous if the government were statutorily precluded from resolving a protest by taking action to grant a protestor the principal remedy it seeks. IDS does not cite any case in which the court has held that the government's decision to terminate

the protested solicitation or contract award violates the stay provisions of HRS § 103D-701(f). Rather, the Hawai'i Supreme Court's decision in CARL Corp. v. State, Dep't of Educ., 93 Hawai'i 155, 997 P.2d 567 (2000) (hereinafter, "CARL II"), indicates that despite the pendency of a protest, the government retains the ability to terminate the protested contract. CARL II, 93 Hawai'i at 163-65, 997 P.2d 567, 575-77 (holding that (1) the government had the authority to terminate the protested contract despite the supreme court's remand to the hearings officer to decide whether to terminate or ratify the contract, and (2) that the government's termination of the contract rendered the hearings officer's decision moot).

Our interpretation of HRS § 103D-701(f) is also supported by case law from other jurisdictions. In Caber Systems, Inc. v. Dep't of Gen. Services, 530 So.2d 325, 336 (Fla. Dist. Ct. App. 1988), the court construed a Florida statute similar to HRS § 103D-701(f) which provided that "'the agency shall stop the bid solicitation process or the contract award process until the subject of the protest is resolved by final agency action.'" The court construed this language

> to mean that the Department [of General Services] could not continue the bidding process leading toward the *award* of any contract to other bidders until a bidder's protest had been resolved, but not that the Department was also precluded from immediately *rejecting* all bids and initiating a new [invitation to bid] upon discovery of valid grounds for doing so. . . . There is no limitation in the statutory language restricting the Department's power to immediately reject all bids and start the bid process anew with a valid [invitation to bid], rather than locking up the entire process pending hearing on the protest so that nothing could proceed. Once [the Department] had decided to reject all bids for the reason specified, to first await the outcome of a hearing on Caber's first protest before taking action would be a complete waste of time and taxpayers' money.

Id. (emphasis in original).

II.

A.

The Circuit Court ruled that IDS's appeal of the hearings officer's decision was moot because the DOTA's cancellation of the Kahului Airport Project meant that no

enforceable contract could be awarded to IDS, even if IDS prevailed on its protest. The Circuit Court cited HRS § 103D-309, which provides that contracts awarded by the government "shall neither be binding nor have any force and effect of law" unless the appropriate financial officer verifies that there are sufficient funds appropriated for the contract. The Circuit Court reasoned that where the State has no funds to pay for the Kahului Airport Project and has cancelled the Ford contract, it would be "absurd" for the law to require a remand for a determination of the merits of IDS's protest.

> In general, "this court does not have jurisdiction to decide abstract propositions of law or moot cases." Lathrop v. Sakatani, 111 Hawai'i 307, 312, 141 P.3d 480, 485 (2006) (citation, internal quotation marks, and brackets omitted). "A case is moot where the question to be determined is abstract and does not rest on existing facts or rights." In re Application of Thomas, 73 Haw. 223, 226, 832 P.2d 253, 254 (1992).

> > A case is moot if it has lost its character as a present, live controversy of the kind that must exist if courts are to avoid advisory opinions on abstract propositions of law. The rule is one of the prudential rules of judicial self-governance founded in concern about the proper-and properly limited-role of the courts in a democratic society. We have said the suit must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar.

> Kona Old Hawaiian Trails Group v. Lyman, 69 Haw. 81, 87, 734 P.2d 161, 165 (1987) (citations, internal quotation marks, and brackets omitted).

> > The mootness doctrine is said to encompass the circumstances that destroy the justiciability of a suit previously suitable for determination. Put another way, the suit must remain alive throughout the course of litigation to the moment of final appellate disposition. Its chief purpose is to assure that the adversary system, once set in operation, remains properly fueled. The doctrine seems appropriate where events subsequent to the judgment of the trial court have so affected the relations between the parties that the two conditions for justiciability relevant on appeal-adverse interest and effective remedy-have been compromised.

> Lathrop, 111 Hawai'i at 312-13, 141 P.3d at 485-86 (citations and block quote format omitted).

Queen Emma Foundation v. Tatibouet, 123 Hawai'i 500, 506-07, 236 P.3d 1236, 1242-43 (App. 2010).

B.

IDS does not dispute that its request to terminate the contract awarded to Ford has been rendered moot by the DOTA's cancellation of the Kahului Airport Project and termination of the contract with Ford. IDS, however, contends that its request for proposal preparation costs pursuant to HRS § 103D-701(g) prevents its case from being moot.

HRS § 103D-701(g) provides:

> In addition to any other relief, when a protest is sustained and the protestor should have been awarded the contract under the solicitation but is not, then the protestor shall be entitled to the actual costs reasonably incurred in connection with the solicitation, including bid or proposal preparation costs but not attorney's fees.

The Hawai'i Supreme Court has stated that under HRS § 103D-701(g), a protesting bidder is entitled to recover its bid preparation costs "if: (1) the protest is sustained; (2) the protestor should have been awarded the contract; and (3) the protestor is not awarded the contract." CARL I, 85 Hawai'i at 456, 946 P.2d at 26. Under this test, the merits of an underlying protest must be decided and a determination that the protestor should have been awarded the contract must be made for a protestor to be entitled to recover its bid or proposal preparation costs.

IDS argues that it is entitled to have the hearings officer determine the underlying merits of its protest and whether it should have been awarded the contract, even though the contract can no longer be awarded, so that it can pursue its request for proposal preparation costs under HRS § 103D-701(g). We disagree. We conclude that as a general rule, the cancellation of the underlying project and termination of the protested contract renders moot an unsuccessful bidder's protest of the contract award. There is an exception to this general rule where the protestor can show that the government acted in

18

bad faith or arbitrarily and capriciously in cancelling the underlying project and terminating the protested contract. However, IDS has failed to make this showing.

In Queen Emma Foundation, this court addressed the analogous situation of whether an appeal of the trial court's award of attorney's fees and costs to the prevailing party kept alive the underlying controversy over the interpretation of a lease, which had become moot due to the post-appeal transfer of appellant Tatibouet's interest in the lease in bankruptcy proceedings. Queen Emma Foundation, 123 Hawai'i at 503, 236 P.3d at 1239. Tatibouet challenged the trial court's award of attorney's fees and costs on the ground that the trial court had erroneously resolved the merits of the lease claim and found the other party, The Queen Emma Foundation, to be the prevailing party in the case. Id. He argued that because his appeal of the award of attorney's fees and costs turned on the merits of the lease claim, this court was required to resolve the merits of the dispute over the interpretation of the lease. Id. at 504, 236 P.3d at 1240.

We rejected this argument, holding that Tatibouet's appeal of the trial court's award of attorney's fees and costs did not permit adjudication of an otherwise moot controversy regarding the merits of the underlying lease claim. Id. at 509-10, 236 P.3d at 1245-46. We concluded that "[w]here the underlying controversy has become moot, 'there is no right to review or redetermine any of the issues in the underlying action solely for the purpose of deciding the attorney's fees question.'" Id. (citation omitted).[10]

Queen Emma Foundation supports our conclusion that IDS's claim for proposal preparation costs does not keep alive

---

[10] Based on this analysis, we declined to examine the correctness of the trial court's determination of the merits of the underlying lease claim and limited our review to whether The Queen Emma Foundation, Tatibouet's adversary, was the prevailing party based on the outcome of the trial court proceedings. Queen Emma Foundation, 123 Hawai'i at 510-11, 236 P.3d at 1246-47.

IDS's underlying protest over whether the contract for the Kahului Airport Project was properly awarded to Ford, which became moot after the DOTA cancelled the project and terminated Ford's contract. Queen Emma Foundation also supports our conclusion that IDS is not entitled to a determination of the merits of its protest and whether it should have been awarded the contract, which are predicate determinations that must be made for IDS to demonstrate its entitlement to the recovery of proposal preparation costs.

In CCL Service Corp. v. United States, 43 Fed. Cl. 680 (1999), the United States Court of Federal Claims held, in protests filed over the award of federal procurement contracts, that the protestors' claims for bid preparation and proposal costs did not survive the termination of the protested contracts and the cancellation of the solicitation for the contracts. CCL, 43 Fed. Cl. at 689-90. The plaintiffs in CCL, who were unsuccessful bidders on government computer maintenance contracts, filed protests of the award of the contracts to a competitor. Id. at 681. After extensive litigation, the government terminated the contracts and cancelled the solicitation before a decision on the merits of plaintiffs' protests had been made. Id. at 683-86.

The CCL court addressed the question of whether plaintiffs' claims for bid preparation and proposal costs survived the government's termination of the protested contracts and cancellation of the solicitation, and it concluded that these claims did not survive. Id. at 689-90. The court noted that the cancellation of the solicitation prevented the reinstatement of the award to the competitor and mooted the question of the propriety of the award to the competitor. Id. at 690. The court stated that "[t]he mere fact that plaintiffs may have been entitled to more relief than they received had there been a decision on the merits is insufficient to permit continued litigation in light of [the government's] actions, which have rendered the underlying issue moot." Id. The court concluded

20

that "[h]aving negated any impropriety by canceling the award and the solicitation, [the government] has precluded the court from making a finding regarding [whether error occurred in the procurement process]." Id. The court reasoned that a decision on the merits of the contract award must be made prior to the award of bid preparation and proposal costs, and it held that without analysis of the merits of the contract award, the court lacked a basis to grant relief on plaintiffs' claims for such costs. Id.

The court recognized an exception to the rule barring a protestor from recovering bid preparation and proposal costs in the event of a cancelled solicitation and award, where the government's conduct in cancelling the solicitation and award "is found to be arbitrary or capricious and prejudicial." Id. at 691. The court observed, that it

> is aware of the potential harm to plaintiffs in permitting the Government the opportunity to avoid litigation by canceling the solicitation upon protest. Although the Government should be allowed to take corrective action to resolve disputes regarding a procurement in an efficient manner, the Government is not entitled to avoid liability by merely canceling a solicitation flawed inherently or in its execution.

Id. at 690 (citation omitted). However, because the plaintiffs did not contest the cancellation of the solicitation, the court held that it could not determine whether the exception applied. Id. at 691-92.

C.

The purposes of the Hawai'i Public Procurement Code (Procurement Code) are to:

> (1) Provide for fair and equitable treatment of all persons dealing with the government procurement system;
>
> (2) Foster broad-based competition among vendors while ensuring accountability, fiscal responsibility, and efficiency in the procurement process; and
>
> (3) Increase public confidence in the integrity of the system.

21

CARL I, 85 Hawai'i at 456, 946 P.2d at 26 (quoting S. Stand. Comm. Rep. No. S8-93, in 1993 Senate Journal, Special Sess., at 39).

Permitting IDS to pursue its request for proposal preparation costs despite the cancellation of the Kahului Airport Project would be contrary to the purpose of the Procurement Code to ensure efficiency and fiscal responsibility in the procurement process. It would require the State to incur the costs of engaging in litigation over the merits of IDS's protest of the contract award to Ford and whether IDS should have been awarded the contract, even though there is no longer any contract to award. On the other hand, permitting IDS to pursue its request for proposal preparation costs might result in revealing improprieties in the procurement process and advance the purposes of the Procurement Code to provide for fair and equitable treatment of bidders and increase public confidence in the integrity of the system.

In balancing these interests, we conclude that it is appropriate to recognize an exception to the general rule barring a protestor from recovering bid or proposal preparation costs where the project has been cancelled and the contract award terminated. This exception would apply where the protestor can show that the government acted in bad faith or arbitrarily and capriciously in cancelling the project and terminating the protested contract. Such an exception would be consistent with the approach used by the Hawai'i Supreme Court in creating a right to recover attorney's fees as a remedy for the government's bad faith in failing to comply with the requirements of the Procurement Code. See CARL I, 85 Hawai'i at 458-61, 946 P.2d at 28-31. It would also be consistent with the approach taken by the United States Court of Federal Claims and the United States Court of Claims in federal procurement cases. See CCL, 43 Fed. Cl. at 690-91; Keco Indus., Inc. v. United States, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974).

We conclude that IDS has failed to meet its burden of showing that this exception applies in this case. In opposing the DOTA's motion to dismiss, IDS specifically argued that the DOTA's cancellation of the Kahului Airport Project, which led to the termination of the contract awarded to Ford, was unjustified, improper, and "an act of bad faith." On the other hand, the DOTA argued that the cancellation of the Kahului Airport Project and the underlying solicitation for the project was necessitated by budgetary constraints, was reasonable, and was in the best interests of the government. After considering the arguments and evidence presented by the parties, the hearings officer rejected IDS's arguments. The hearings officer found that the DOTA's cancellation of the solicitation for the Kahului Airport Project was justified "due to budget constraints related to . . . the current financial crisis" and that "there was no evidence that the cancellation was motivated by an improper purpose." We conclude that these findings were based on substantial evidence and were not clearly erroneous. Accordingly, we are bound by these findings, which establish that the DOTA did not act in bad faith or arbitrarily and capriciously in cancelling the Kahului Airport Project and terminating the contract awarded to Ford, but rather acted properly in making its decision.[11]

---

[11] IDS's reliance on Arizona's Towing Prof'ls, Inc. v. State, 993 P.2d 1037 (Ariz. Ct. App. 1999), is misplaced. In Arizona's Towing, Shamrock Towing (Shamrock) was awarded a procurement contract over Western Towing (Western), and Western filed a bid protest. Id. at 1038. The government agency upheld Western's bid protest and cancelled Shamrock's contract on that basis. Id. at 1039. However, after Shamrock filed an appeal of this decision, the government agency notified Shamrock that it was cancelling Shamrock's contract pursuant to a cancellation for convenience clause in the invitation for bids. Id. On judicial review, the Arizona Court of Appeals rejected the government agency's claim that the cancellation for convenience of Shamrock's contract rendered moot Shamrock's challenge to the government agency's decision to uphold Western's bid protest and cancel Shamrock's contract based on Western's protest. Id. at 1041-42. The court concluded that every contract imposes a duty of good faith and fair dealing. Id. at 1041. The court found that the government agency "did not act in good faith" because it had "invoked the cancellation for convenience provision in an effort to render moot Shamrock's appeal of its original cancellation over the bid protest" and because the government agency did not have a valid reason for cancelling Shamrock's contract. Id. at 1041-42. The court stated that the government agency "should not be permitted to use the cancellation for

(continued...)

D.

IDS contends that certain actions taken by the DOTA after the Circuit Court affirmed the hearings officer's Order Granting Motion to Dismiss support its claim of bad faith on the part of the DOTA and asks this court to take judicial notice of these actions. However, HRS § 103D-710(d) (2012) provides that judicial review of the hearings officer's decision by the circuit court "shall be conducted on the record of the administrative proceedings, and briefs and oral argument. No new evidence shall be introduced, except that the circuit court may, if evidence is offered which is clearly newly discovered evidence and material to the just decision of the appeal, admit the same." The evidence proffered by IDS was not part of the administrative record and it was not considered by the Circuit Court. We therefore decline to consider it.

III.

IDS argues that it is entitled to have the merits of its protest resolved so that it can pursue its request for attorney's fees incurred in prosecuting its protest.[12] IDS's argument is based on its contention that the DOTA violated HRS § 103D-701(f) and acted in bad faith in cancelling the Kahului Airport Project. We have already rejected these contentions. We

_____

[11] (...continued)
convenience provision to thwart administrative or judicial review of its decisions. Id. at 1041.

Here, the terminated contract had been awarded to Ford, and not to IDS. Therefore, unlike the aggrieved party in Arizona's Towing, IDS is not contesting the government's termination of a contract that had been awarded to IDS. More importantly, unlike in Arizona's Towing, we have concluded, based on the hearings officer's findings, that the DOTA did not act in bad faith, but rather had a valid reason and proper purpose for terminating Ford's contract. Thus, Arizona's Towing is distinguishable and does not show that IDS is entitled to relief.

[12] In CARL I, the Hawai'i Supreme Court held that "a protestor is entitled to recover its attorney's fees incurred in prosecuting its protest if: (1) the protestor has proven that the solicitation was in violation of the [Procurement] Code; (2) the contract was awarded in violation of HRS § 103D-701(f); and (3) the award of the contract was in bad faith." CARL I, 85 Hawai'i at 460, 946 at 30.

24

conclude that IDS's claim for attorney's fees did not survive the cancellation of the Kahului Airport Project or render the dismissal of its case improper.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Final Judgment.

Terry E. Thomason
(Corianne W. Lau and
Shannon M.I. Lau (Alston
Hunt Floyd & Ing, A Law
Corporation) with him on
the briefs)
for Appellant-Appellant

Stella M.L. Kam
(Donna H. Kalama with her
on the brief)
Deputy Attorneys General
for Appellees-Appellees
Brennon T. Morioka and
Designees of Aaron Fujioka

*Craig H. Nakamura*

*Daniel R. Foley*

*Alexa D.M. Fujise*